**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| UNITED STATES OF AMERICA, | No. 4:18-CR-00083 |
|---|---|
| | (Chief Judge Brann) |
| v. | |
| DAVID TAYLOR, | |
| Defendant. | |

**MEMORANDUM OPINION**

**SEPTEMBER 17, 2021**

On July 18, 2017, Defendant David Taylor was caught in bed with a fourteen-year-old girl. It was not the first time police found Taylor illicitly engaged with a minor. Indeed, Taylor is subject to parole for life after serving a prison sentence for endangering the welfare of a child—he admitted to having sex with a twelve-year-old. Taylor now seeks to prevent the Government from admitting into evidence at trial the statements and physical evidence obtained through the initial warrantless search conducted by his parole officer, who found the child in Taylor's bed, and a subsequent search by the Gloucester Township, New Jersey Police Department. However, both searches were constitutional: the parole officer had reasonable suspicion to believe a search would yield evidence of a parole violation, and Taylor gave Gloucester Township Police consent to search. For these reasons, Taylor's motion to suppress is denied.

# I.      BACKGROUND

## A.      History of Taylor's Parole

On July 22, 2011, Taylor was sentenced by the Camden County (New Jersey) Superior Court to five years of imprisonment and parole supervision for life following his guilty plea to endangering a child (he admitted to having intercourse with a twelve-year-old female child).[1] On February 22, 2013, New Jersey released Taylor from prison and placed him on parole.[2] Taylor's parole agreement required him to, among other things: "[S]ubmit to a search conducted by a parole officer, without a warrant, of [his] person, place of residence, vehicle or other real or personal property within [his] control at any time a parole officer has a reasonable, articulable basis to believe that the search will produce contraband or evidence that a condition of supervision has been violated, is being violated or is about to be violated and permit the confiscation of any contraband."[3] New Jersey Parole Officer Justin Lee oversaw Taylor's supervision from September 2016 through July 2017.[4]

Consistent with the terms of Taylor's parole agreement, Officer Lee made monthly visits to the boarding house where Taylor lived to ensure that Taylor was in fact living at the residence and abiding by the terms of his parole.[5] He conducted

---

[1]    Doc. 62 at 3; Doc. 67 at 2.
[2]    Doc. 62 at 3.
[3]    Doc. 61, Ex. A.
[4]    Doc. 101 at 3.
[5]    Doc. 92 at 17:5–12, 20:13–20.

eleven in-person supervisory home visits to Taylor's residence prior to the July 2017 visit at issue here.[6] During his testimony before this Court at a hearing on the instant motion, Officer Lee stated that each time he arrived at Taylor's house for a supervisory visit, he and Taylor would go to Taylor's bedroom to discuss his employment status and counseling arrangements as well as whether Taylor had any interactions with law enforcement.[7] On cross-examination, Officer Lee acknowledged that Taylor typically met him at the front door and then ushered him through the house to Taylor's bedroom; Officer Lee could not recall any instance in which he was let into the house by someone other than Taylor and then confronted Taylor, in the first instance, at the threshold to his bedroom.[8]

### B.    Officer Lee's Search of Taylor's Room

On July 18, 2017, Officer Lee went to Taylor's boarding house to conduct a supervisory visit. Although Officer Lee texted Taylor that morning saying he would be "stopping by soon," they did not schedule a specific date or time for the visit.[9] Later that day, Officer Lee drove past the house where Taylor lived and spotted Taylor's motorcycle out front, so he stopped by to conduct a home visit.[10] Officer Lee tried to call Taylor, but he got no response.[11] He then went and

---

[6]    Doc. 101 at 3.
[7]    Doc. 92 at 22:1–19.
[8]    *Id*. at 55:2–56:14.
[9]    *Id*. at 31:16–32:13.
[10]    *Id*. at 32:21–33:2.
[11]    *Id*. at 33:9–13.

knocked on the front door, and, after a slight delay, a separate resident "came forward and opened the front door to let [him] in."[12]

Once inside the boarding house, Officer Lee "went to Mr. Taylor's room, to his door, and was knocking on that door."[13] Officer Lee noticed that the lights in Taylor's room were on and the air conditioner was running.[14] Officer Lee testified that Taylor delayed in opening the door, which he considered unusual because Taylor "usually was pretty forthcoming, and he usually came to the door right away if he was home."[15] When Taylor opened the door, "he tried to crack the door basically and slide out to come out -- out and greet [Officer Lee] in the kitchen, like he was trying to not open the door fully."[16] Officer Lee testified that he considered this behavior "very suspicious" because Taylor "normally opened the door and greeted me and let me walk right in."[17]

At that point, Officer Lee "instructed [Taylor] to step in to his room, to open the door."[18] Officer Lee followed Taylor into the bedroom and then noticed there was someone in Taylor's bed lying under the blankets.[19] Officer Lee asked Taylor if there was someone in the bed, and Taylor said "she's sleeping, a friend."[20] When

---

[12] *Id.* at 33:3–8.
[13] *Id.* at 33:14–17.
[14] *Id.* at 33:18–25.
[15] *Id.* at 34:2–4.
[16] *Id.* at 34:8–15.
[17] *Id.* at 34:16–19.
[18] *Id.* at 34:23–35:4.
[19] *Id.* at 35:8–20.
[20] *Id.* at 46:9–11.

the blanket was pulled back, Officer Lee identified an "extremely young" looking female in the bed, and Taylor said that "he did not have sex with her."[21] Officer Lee then handcuffed Taylor, placed him in custody, and contacted the Gloucester Township Police Department.[22]

### C.    Gloucester Township Police's Search of Taylor's Room

Shortly thereafter, several officers from the Gloucester Township Police Department arrived at Taylor's house and approached him about getting his consent to search the bedroom. To that end, Detective Obermeier ("DO") and Taylor ("DT") had the following exchange:

> **DO**: Alright Dave so what we wanna do from here is we want to get you continue your cooperation. I understand you've been cooperative right from the get-go uh with your parole officer. . . . We wanna we wanna continue and investigation here alright? And we want you we anticipate that you continue to cooperate with us alright? So basically we want to go back into the apartment and just take some pictures of the apartment to show that you know you're around you're paying rent here. You do rent a room here you're supposed to be here. You're registered here right? Yeah your driver's license has you here as well?
>
> **DT**: Yeah I can grab that for you.
>
> **DO**: Alright so um what this is is this is a right signing over consent for us to search alright? Your apartment your room. And we're gonna go in and just take some pictures of everything okay? If there's anything that belongs or that doesn't belong to you that belongs to the

---

21  *Id*. at 36:3–12.
22  *Id*. at 37:8–20.

> person that was in the room with you then we're gonna
> take that out of there.
>
> **DT**: Okay.[23]

Detective Obermeier then presented Taylor with a consent form authorizing

the Gloucester Township Police to search Taylor's bedroom. While looking over

the form, Detective Obermeier and Taylor had the following exchange:

> **DO**: Alright so you're going to read this here and
> understand that you do have the right to refuse and then
> uh we'll write your address on here and then you're
> gonna sign and date this okay? You can just put it right
> up here.
>
> **DT**: This is kind of throwing me off. Why does it say my
> right to stop search at any time?
>
> **DO**: So you can you can come into the room with us.
>
> **DT**: Yeah like I understand that but like my right to be
> present during search.
>
> **DO**: Yeah you'll be inside the apartment with us okay?
> And then uh if there's something going on that you don't
> like or that you don't want us to be in then you can stop it
> at any time and.[24]

Taylor was placed in the kitchen while an officer from the Gloucester

Township Police crime scene unit conducted a search. Officer Douglas Wallace

testified that Taylor was seated "maybe 10 feet from his door," and that he had a

direct line of sight into the bedroom.[25] The bedroom door was kept open

---

[23]    Doc. 97, Ex. A at 8.

[24]    *Id*. at 8–9.

[25]    Doc. 92 at 76:7–11.

throughout the search,[26] and Taylor spoke with the officers while they photographed parts of the room and collected evidence.[27] Taylor assisted officers in identifying which objects belonged to him versus those that belonged to the girl, and they explicitly discussed specific items belonging to Taylor as officers placed the items in evidence bags.[28] In total, officers collected seventeen items from Taylor's room, including the sheets and comforter from Taylor's bed as well as a Department of Corrections baseball cap, cell phone, and sports bra.[29]

Near the end of the search, Taylor asked whether he could go into the room. He had the following exchange with Officer Wallace ("OW") and the crime unit representative, Patrick Cunane ("CU"):

> **DT**: Can I see um what exactly he is bagging up?
>
> **OW**: Here you go Pat.
>
> **DT**: It seems like he's on that side of the room a lot and it's like I don't know what could possibly be over there.
>
> **OW**: Well you know the female was laying in the bed so we're looking for her property making sure we got everything. Is there something you don't want us to touch?
>
> **DT**: No it's just I don't understand why he's on that side of the bed pulling out bags like that's what I don't get like do you mind if I take a walk in?

---

[26] *Id*. at 76:12–13
[27] Doc. 97, Ex. D at 8–9, 16.
[28] *Id*. at 11–14, 16–17, 23.
[29] Doc. 97 at 6; *see also* Doc. 92 at 118:15–21.

**OW**: Detective do you mind if he comes in and takes a look?

**CU**: (no response)

**DT**: (UI) I was told I was able to be present and everything I'm just trying to understand like why he's on that side of the room like a lot.

**OW**: Well everything's over there I mean.

**DT**: Yeah everything wasn't over there though.

**OW**: What is it that you're saying wasn't over there?

**DT**: Like am I allowed to come over there?

**CU**: Yeah give me one second I'm almost done.[30]

Asked about this exchange, Detective Cunane stated that he did not let Taylor into the room for two reasons: "One was officer safety, just the size of the room. There was really nowhere to go. And two, when the question was made, the comforter was in, and I was pretty much done. Everything, all the listed items that I already mentioned were already collected."[31] At no time did Taylor state or otherwise imply that he wanted the search to stop.[32]

After the officers completed the search, they transported Taylor to the Gloucester Township Police Department for questioning.[33]

---

[30] Doc. 97, Ex. D at 16.
[31] Doc. 92 at 122:20–123:3.
[32] See Doc. 97, Exs. A & D.
[33] See Doc. 97 at 8–10; Doc. 101 at 10–11.

### D.   Procedural Posture

On March 8, 2018, a grand jury empaneled in the Middle District of
Pennsylvania returned a three-count indictment[34] charging Taylor with the
production of child pornography,[35] the transportation of a minor to engage in
sexual activity,[36] and an offense by a registered sex offender.[37] Although the events
presently at issue occurred in New Jersey and involved New Jersey parole and
police officers, the charges were brought here in this Court—rather than the
District of New Jersey—because the victim is from, and certain criminal conduct
allegedly occurred in, the Middle District of Pennsylvania.

On October 18, 2019, Taylor filed a motion to suppress,[38] which he amended
on June 24, 2020.[39] Taylor asked the Court to suppress the following: (1) the
physical evidence and statements secured during Officer Lee's search; (2) the
physical evidence recovered during the Gloucester Township Police's search of his
room; and (3) Taylor's statements made during the interrogation at the Gloucester
Township Police station.[40] The Government filed its opposition on July 17, 2020.[41]

---

[34]   Doc. 1.
[35]   18 U.S.C. § 2251(a), (e).
[36]   18 U.S.C. § 2423(a).
[37]   18 U.S.C. § 2260A.
[38]   Doc. 39.
[39]   Doc. 61.
[40]   Doc. 62 at 7–8. In its Opposition, the Government agreed not to offer as evidence in its case-in-chief the statements Taylor made during the interrogation at the Gloucester Township Police station. *See* Doc. 67 at 7–8. Accordingly, Taylor is not advancing his request to suppress these statements at this time. *See* Doc. 97 at 8 n.9, 9 n.10.
[41]   Doc. 67.

On February 23, 2021, the Court convened the parties for a hearing on Taylor's motion.[42] The Government offered testimony from Officer Lee as well as two detectives from the Gloucester Township Police Department, Officer Wallace and Detective Cunane.

At the hearing, the Court granted the parties leave to file supplemental briefing on this motion.[43] The parties submitted their supplemental briefing papers,[44] and, thus, the matter is now ripe for disposition.

## II.    DISCUSSION

### A.    Officer Lee's Search of Taylor's Room

Taylor asks the Court to suppress the physical evidence and statements secured during and after Officer Lee's search of Taylor's bedroom, arguing that such evidence qualifies as the "fruit of the poisonous tree"—that is, the product of an unconstitutional search. Specifically, Taylor argues that Officer Lee's warrantless search of his room violated his Fourth Amendment right against unreasonable searches because Officer Lee did not have the required "reasonable suspicion" to enter Taylor's room. The Court disagrees.

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable

---

[42]    *See* Doc. 92.
[43]    *Id*. at 153: 2–6, 156:10–158:3
[44]    *See* Docs. 97, 101, 102.

cause supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." As a general proposition, warrantless searches are *per se* unreasonable, subject to specific exceptions.[45] One such exception concerns warrantless searches of an individual on parole.

When considering the constitutionality of a warrantless search of a parolee or a parolee's property, courts have held that "parolees are more akin to prisoners than probationers" and are subject to greater restrictions (and fewer protections) than the general members of the public.[46] Accordingly, the United States Court of Appeals for the Third Circuit explained that a state may "empower a parole officer to conduct a warrantless search of a parolee's property based on reasonable suspicion that the parolee has violated a condition of parole."[47] The New Jersey statute that codifies a parole officer's authority to conduct a warrantless search follows this precedent and requires reasonable suspicion.[48]

Unlike probable cause, which is defined as a "fair probability that contraband or evidence of a crime will be found," reasonable suspicion is merely a particularized and objective basis for suspecting criminal activity.[49] In determining whether reasonable suspicion exists, parole officers should "draw on their own experience and specialized training to make inferences from and deductions about

---

[45] *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987).
[46] *Samson v. California*, 547 U.S. 843, 850 n.2 (2006).
[47] *United States v. Strickland*, 237 Fed. Appx. 773, 777 (3d Cir. 2007).
[48] N.J. A.C. 10A:72–1.1.
[49] *United States v. Sokolow*, 490 U.S. 1, 7–8 (1989).

the cumulative information available to them that might well elude an untrained person."[50]

The Government contends that Officer Lee developed a reasonable suspicion that Taylor's room contained evidence of a parole violation because of Taylor's "comparatively evasive conduct."[51] In contrast to Officer Lee's prior supervisory home visits with Taylor, on July 18, 2017, Taylor delayed in opening his bedroom door and then "immediately attempt[ed] to prevent Officer Lee from entering the bedroom."[52]

In his bid to prevent the Government from introducing at trial evidence adduced from Officer Lee's search, Taylor first argues that the Government failed to present the requisite "specific facts" needed to establish reasonable suspicion. Taylor directs the Court to *United States v. Baker*[53] and *United States v. Jackson*[54]; however, both cases are distinguishable.

In *Baker*, parole officers arrested the defendant, a parolee, for driving a vehicle in violation of the conditions of his parole.[55] After learning that the car was registered in someone else's name, the officers conducted a warrantless search of the trunk and found drug paraphernalia.[56] The Third Circuit held that "neither [the

---

[50]   *United States v. Henley*, 941 F.3d 646, 651–52 (3d Cir. 2019).
[51]   Doc. 101 at 12.
[52]   *Id.*
[53]   221 F.3d 438 (3d Cir. 2000).
[54]   No. 1:14-CR-054, 2014 U.S. Dist. LEXIS 162700 (M.D. Pa. Nov. 20, 2014).
[55]   221 F.3d at 440.
[56]   *Id.* at 440–41.

defendant's] violation of his parole by driving a vehicle nor his failure to document that he owned that vehicle [could] give rise to a reasonable suspicion that he was committing other, unspecified, unrelated parole violations—the evidence of which might be found in the trunk."[57]

The Third Circuit's reasoning rested on the physical location searched, as it found that the Government failed to establish reasonable suspicion that evidence of further violations would be in the trunk of the car. Here, there is no question that Officer Lee's suspicions specifically concerned Taylor's bedroom. Based on Taylor's delay in coming to the door and his effort to "slide out" of the room without allowing Officer Lee to see inside, Officer Lee believed that Taylor was trying to keep him from entering the bedroom.[58] This conduct, coupled with Officer Lee's knowledge that Taylor was a convicted sex offender, led Officer Lee to reasonably suspect that Taylor's bedroom could contain evidence of a parole violation.[59]

In *Jackson*, two parole officers headed to a meeting with parolees who violated conditions of their parole saw the defendant (one of the parolees

---

[57]   *Id*. at 445
[58]   *See* Doc. 45 at 34:11–19.
[59]   *See United States v. Yuknavich*, 419 F.3d 1302, 1311 (11th Cir. 2005) (finding reasonable suspicion where officers "had knowledge of [the defendant's] two prior convictions" and defendant "delayed ten minutes in opening the door"); *United States v. Hamilton*, 591 F.3d 1017, 1023–24 (8th Cir. 2010) (finding reasonable suspicion where officers knew of defendant's previous convictions related to child pornography and defendant delayed an "inordinate amount of time" before answering the door).

scheduled to attend the meeting) driving a vehicle on the road outside the meeting location.[60] Both officers noticed that the defendant turned his head away from them, which they interpreted as the defendant trying to conceal his identity.[61] When the defendant arrived at the meeting, the officers took his car keys and searched the vehicle without his consent or a warrant.[62] The court held that this search was unlawful because the officers "did not have reasonable suspicion supported by specific facts to search the vehicle": the defendant averting his eyes when he saw the officers provides, "at most, a mere hunch that legal wrongdoing is occurring."[63]

Here, Officer Lee's suspicion was predicated on more than a mere furtive glance. As noted, Taylor's conspicuous exit from his bedroom led Officer Lee to believe that Taylor was deliberately attempting to keep him from seeing into the bedroom—a location of particular concern given Taylor's prior offense. Taken together, the location of the interaction, context preceding the search, and nature of the defendant's allegedly suspicious conduct render *Jackson* inapposite.

Second, Taylor argues that the Government's emphasis on the alleged inconsistency in Taylor's behavior the day of the search versus Officer Lee's prior supervisory home visits is misplaced. The Government notes that during the

---

[60]   2014 U.S. Dist. LEXIS 162700 at *2–4.
[61]   *Id.*
[62]   *Id.* at *7–8.
[63]   *Id.* at *17–20.

suppression hearing, Officer Lee testified that Taylor's "actions on July 18, 2017 were wholly inconsistent with his behavior at their eleven prior face-to-face home visits," where Taylor "always opened his bedroom door and allowed Officer Lee to enter."[64] However, Taylor correctly asserts that the Government's characterization of Officer Lee's testimony omits relevant context that Officer Lee provided on cross-examination. Specifically, Officer Lee acknowledged on cross that on all eleven prior home visits, "Taylor had met him at the front door after receiving a text that he arrived" and that Officer Lee "had never previously confronted Taylor at this bedroom door without first letting him know that he had arrived at the home."[65]

This context arguably provides a reasonable explanation for why Taylor behaved differently on this occasion as compared to the prior home visits. But that alone does not settle the matter. The question here is not whether some reasonable explanation can be provided for Taylor's suspicious behavior, but rather, whether Officer Lee, based on the facts available to him and his experience as a parole officer, had a reasonable suspicion that evidence of a parole violation would be found in Taylor's room.[66] As explained above, the Court finds that he did. Taylor may be correct that differing circumstances will often produce different conduct,

---

[64]   Doc. 101 at 11–12; *see also* Doc. 92 at 24:5–11.
[65]   Doc. 102 at 3 (citing Doc. 92 at 55–56).
[66]   *See Henley*, 941 F.3d at 651–52.

but that does not negate the reasonable suspicion premised on Taylor's objectively suspicious behavior.

Third, Taylor argues that to the extent Officer Lee did have reasonable suspicion to search Taylor's bedroom based on what he observed while standing outside Taylor's door, the search nevertheless runs afoul of the Fourth Amendment because Officer Lee did not have consent to be in Taylor's house in the first place. However, at the suppression hearing, Officer Lee gave the following testimony about how he gained access to Taylor's house: "I was knocking at the front door, and nobody came to the door immediately. And then another resident, because I kept knocking at the door, came forward and opened the front door to let me in."[67] Officer Lee's characterization of this sequence of events went uncontested, as Taylor's counsel did not elicit contradictory testimony on cross-examination and did not present any witnesses who disputed Officer Lee's account of his entry. It is well settled that "police officers may search jointly occupied premises if one of the occupants consents."[68] Accordingly, the Court finds that the Government has established that Officer Lee was lawfully permitted to enter Taylor's house.

Because Officer Lee was lawfully present inside Taylor's house and had reasonable suspicion that Taylor's bedroom contained evidence of a parole violation, his search did not violate Taylor's Fourth Amendment rights.

---

[67] Doc. 92 at 33:5–8.
[68] *Fernandez v. California*, 571 U.S. 292, 294 (2014) (citing *United States v. Matlock*, 415 U.S. 164 (1974)).

### B.    Statements Taylor Made to Officer Lee

The Government seeks to introduce Taylor's response to Officer Lee's question as to who was in the room with Taylor (i.e., "she's sleeping" and "a friend") as well as Taylor's statement after Officer Lee asked how old the girl was (i.e., "I did not have sex with her").[69] Taylor argues that these statements should be suppressed for two reasons: (1) the statements constitute the "fruit of the poisonous tree," as they were obtained during an unconstitutional search[70]; and (2) the statements were obtained in violation of the Fifth Amendment because Taylor was not given *Miranda* warnings.[71] The Court finds both of Taylor's arguments unpersuasive.

First, to suppress evidence as "fruit of the poisonous tree," the Court must, as an initial matter, find that the evidence was either a direct or derivative result of unconstitutional conduct.[72] As explained above, Officer Lee's decision to search Taylor's bedroom did not violate Taylor's Fourth Amendment rights as it was supported by reasonable suspicion. Because the initial search was constitutional, the fruit it bore cannot be suppressed on this basis.

---

[69]   Doc. 67 at 13.
[70]   Doc. 97 at 19 (quoting *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006)).
[71]   Doc. 62 at 12–14.
[72]   *See Brown*, 448 F.3d at 244.

Second, in accordance with the Fifth Amendment's protection against self-incrimination,[73] the United States Supreme Court has held that individuals taken into custody must be given the *Miranda* warnings prior to interrogation.[74] To determine whether an individual was "in custody," courts must "ask, as an objective matter, whether a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave."[75] Because the Supreme Court recently clarified that this "freedom-of-movement" test identifies "only a necessary and not a sufficient condition for *Miranda* custody,"[76] courts "must ask the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."[77]

Prior to the suppression hearing, there appeared to be a factual dispute concerning the sequence of events surrounding Officer Lee's questioning. Specifically, the Government represented that Taylor offered the statements at issue prior to being placed in handcuffs,[78] while Taylor asserted that he gave these statements after being handcuffed and instructed that he was not able to leave his

---

[73] U.S. Const. amend. V ("No person . . . shall be compelled in any case to be a witness against himself.")

[74] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[75] *United States v. Ludwikowski*, 944 F.3d 123, 131 (3d Cir. 2019) (internal quotation marks omitted).

[76] *Howes v. Fields*, 565 U.S. 499, 509 (2012).

[77] *Ludwikowski*, 944 F.3d at 131 (internal quotation marks omitted).

[78] *See* Doc. 67 at 15.

room.[79] At the hearing, Officer Lee testified that he entered Taylor's room and asked Taylor and the young female in his bed certain questions, to which Taylor provided the incriminating responses at issue; Officer Lee handcuffed Taylor and "place[d] [him] in custody" only after the statements were made.[80] Taylor appears to have accepted this testimony, as he now describes the interaction as follows:

> Lee ordered Taylor "to step in to his room" and "followed him in." Once inside the room, Lee noticed that there was someone in Taylor's bed lying under blankets. Lee asked Taylor if there was someone in the bed and Taylor said "yes . . . she's sleeping, a friend." Lee identified an "extremely young" looking female in the bed and Taylor told Lee that "he did not have sex with her." Lee handcuffed Taylor, placed him in "custody," and contacted the Gloucester Township Police Department.[81]

Given that the questions and responses preceded Officer Lee's decision to handcuff Taylor and instruct him not to leave the room, the Court finds that the statements were not offered in the course of a custodial interrogation. Accordingly, the absence of *Miranda* warnings does not render the statements inadmissible.

## C.    Physical Evidence Seized from Taylor's Room

Lastly, Taylor argues that the physical evidence the Gloucester Township Police obtained during the warrantless search of Taylor's room should be suppressed because although he initially consented to the search, the officers secured Taylor's consent through false pretenses and then violated the express

---

[79]   *See* Doc. 62 at 13.
[80]   Doc 92 at 35:3–37:20, 57:10–58:1.
[81]   Doc. 97 at 4 (internal citations omitted).

terms of the consent agreement by preventing him from observing or stopping the search. However, the evidence does not support Taylor's contention that the Government misrepresented the scope or nature of the search. There is likewise no evidence that Taylor was impermissibly prevented from exercising his right to cancel the search. He was in the apartment throughout the search and permitted it to continue without objection. Therefore, the physical evidence seized cannot be suppressed on this basis.

### 1.    Validity of Taylor's Consent

The Supreme Court has long recognized that "a search authorized by consent is wholly valid."[82] When the Government "seeks to rely upon consent to justify the lawfulness, [it] has the burden of proving that the consent was, in fact, freely and voluntarily given."[83] For consent to be voluntary, "it cannot be the product of duress or coercion, express or implied."[84] But the Third Circuit has affirmed that "there is no talismanic definition of voluntariness," and as such, instructs district courts to "look to the totality of the circumstances in determining whether consent was voluntary."[85]

---

[82] *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).

[83] *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968).

[84] *United States v. Vaghari*, 500 Fed. Appx. 139, 149 (3d Cir. 2012) (internal quotation marks omitted).

[85] *Id*. (internal quotation marks omitted).

Taylor contends that the Gloucester Township Police "deliberately and materially deceived Taylor regarding the scope of the search," emphatically asserting that "[t]he record is crystal clear."[86] That is simply not the case.

To support his claim that the Gloucester Township Police falsely represented the scope of the search, Taylor notes that an officer told him that "basically we want to go back into the apartment and just some pictures of the apartment to show that you know you're around you're paying rent here" and "[i]f there's anything that belongs or that doesn't belong to you that belongs to the person that was in the room with you then we're gonna take that out of there."[87]  However, it would be improper to interpret these statements as placing a finite limit on the scope of the search, prohibiting the Gloucester Township Police from seizing relevant evidence found in Taylor's bedroom. Taylor's parole agreement explicitly "permit[s] the confiscation of contraband" found in his residence,[88] and police officers conducting a valid search are generally allowed to seize contraband even if that was not the initial purpose of the search.[89]

Moreover, Taylor's conduct throughout the search undercuts his claim that he believed the officers agreed not to seize any of his possessions. Taylor was

---

[86]  Doc. 97 at 17.
[87]  Doc. 97, Ex. A at 8.
[88]  Doc. 61, Ex. A.
[89]  *See*, *e.g.*, *United States v. Davis*, 749 F.2d 292, 294–97 (5th Cir. 1985) (rejecting defendant's claim that his consent to search was obtained through intentional misrepresentation where police stated they were searching for a particular machine gun but then seized other firearms found in defendant's house).

present when officers collected items and removed them from his room.[90] Indeed, the transcript reveals that the officers and Taylor discussed specific items belonging to Taylor—namely, the sheets on Taylor's bed—as they were being collected in evidence bags.[91] Not once did Taylor object.[92] Accordingly, neither the exchange between the Gloucester Township Police and Taylor prior to the consent agreement nor Taylor's conduct during the search establish that officers secured Taylor's consent through deliberate "misrepresentations about the scope of the search."[93]

Taylor's assertion that the Gloucester Township Police misrepresented the degree to which he would be able to observe the search is likewise lacking factual support.  Taylor argues that the Gloucester Township Police "falsely told him . . . that he would be present—*in the room*."[94] But, again, a full review of the transcript reveals a different story.

---

[90] *See* Doc. 97, Ex. D at 9–14; *see also* Doc. 92 at 122:16 –19 ("Q. Do you recall the Defendant asking whether or not he could enter the bedroom? A. I believe I recall him asking once, when I was in the middle of collecting the comforter.").

[91] *See* Doc. 92 at 118:15 –18 ("Q. Do you remember what all you collected in that room? A. Specifically, I mean it was sheets, a hat, one cell phone, I believe a Department of Corrections baseball cap, comforter, and I believe a bra, a sports bra"); Doc. 97, Ex. D at 14–15, 23 ("OW: . . . Do you want the sheets and the uh quilt. Alright we'll take it then. Even if we just hold it for safe keeping we got it. . . . DT: Well can I take a look and make sure that's everything? CU: Yep give me one second. OW: Yep I gotta grab one more thing. You can let him check out the room if you want. . . . You're fucking killing me with them sheets buddy.").

[92] *See United States v. Watkins*, 760 F.3d 1271, 1283 (11th Cir. 2014) (holding that although officer obtained defendant's consent through promises to limit the scope of the search, the defendant's failure to object when wife gave unlimited consent nullified the limitations on the search).

[93] Doc. 97 at 17.

[94] *Id*. (emphasis in the original).

Explaining the terms of the consent agreement, a Gloucester Township Police officer first told Taylor, "[Y]ou can come into the room with us."[95] However, seconds later, the officer provided this clarification: "[Y]ou'll be inside the apartment with us okay? And then uh if there's something going on that you don't like or that you don't want us to be in there you can stop it at any time."[96] Taylor then consented to the search and was placed in the kitchen, which is located just several feet from the bedroom, while an officer conducted the search.[97] Gloucester Township Police officers testified that Taylor was seated in a way that allowed for a line of sight into the bedroom and that the bedroom door was kept open during the search.[98]

Contrary to Taylor's assertion that he was being denied a meaningful opportunity to observe (and object to) the search, the transcript reveals that throughout the search, Taylor asked officers why they were focusing on certain parts of the room,[99] why they were seizing particular objects,[100] and why officers were taking photographs of the room.[101] Although the Gloucester Township Police did deny Taylor's request to enter the room, an officer testifying at the suppression hearing explained that they did so for practical reasons: the small size of the room

---

[95] Doc. 97, Ex. A at 8.
[96] *Id*., Ex. A at 9.
[97] Doc. 92 at 75:21–76:8.
[98] *Id*. at 76:9–13.
[99] Doc. 97, Ex. D at 16.
[100] *Id*., Ex. D at 8–9, 16.
[101] *Id*., Ex. D at 7.

meant "[t]here was really nowhere to go," and when Taylor made the request, the search "was pretty much done."[102]

None of the evidence presented establishes that the Gloucester Township Police "deliberately and materially deceived Taylor regarding the scope of their search to induce him to sign their consent form."[103] To the contrary, a review of the officer's statements prior to obtaining Taylor's consent and conduct during the search confirms that the Gloucester Township Police accurately explained the purpose of the search and Taylor's rights to observe and stop it, if he so wished. Considering the totality of the circumstances, as it must,[104] the Court rejects Taylor's argument that his consent was not "voluntary."

### 2. Taylor's Failure to Stop the Search

When a person consents to a search, he "may delimit as he chooses the scope of the search to which he consents."[105] But once he consents to a search, it becomes "his burden to demonstrate" that he withdrew that consent "by pointing to an act or statement that an objective viewer would understand as an expression of his desire to no longer be searched."[106]

---

[102] Doc. 92 at 122:16–123:3.
[103] Doc. 97 at 17.
[104] *See Vaghari*, 500 Fed. Appx. at 149.
[105] *United States v. Williams*, 898 F.3d 323, 329 (3d Cir. 2018) (citing *Florida v. Jimeno*, 500 U.S. 248 (1991).
[106] *Id.*

Here, the parties agree: Taylor never indicated that he wanted to stop the search. Taylor was positioned directly outside his bedroom and he spoke with the Gloucester Township Police officers throughout the search.[107] But not once during the search did Taylor seek to invoke his right, under the consent agreement, to stop it.[108] Taylor argues that the Gloucester Township Police "prevented him from observing the search and as a result, he could not limit or stop it."[109] This argument has no merit. To the extent Taylor was not given an adequate opportunity to observe the search, this would have provided him an excellent reason to stop or suspend the search. He never did so.

Because Taylor never expressed his desire to no longer be searched, the Court finds that he did not withdraw his consent and thus declines to suppress the physical objects seized on this basis.[110]

---

[107] *See* Doc. 97, Ex. A.

[108] *Id*.

[109] Doc. 62 at 11.

[110] Because the Court finds that the Gloucester Township Police's search of Taylor's room did not violate his Fourth Amendment rights, it need not address whether the contents of Taylor's room would have been obtained inevitably. *See* Doc. 101 at 18–20. However, the Court agrees with the Government that following Officer Lee's lawful search of Taylor's room and discovery that the female in Taylor's bed was fourteen, "a search of the bedroom would have been conducted with the approval of Parole supervisors" and "[t]he same evidence recovered by [Gloucester Township Police] by obtaining consent from the defendant would have been recovered by the New Jersey State Parole investigators." *Id*. at 19. Therefore, even if the Court found the Gloucester Township Police's search unconstitutional, the evidence seized would nevertheless be admissible under the "inevitable discovery doctrine." *See Nix v. Williams*, 467 U.S. 431, 447–48 (1984).

III.    **CONCLUSION**

While subject to life on parole following a prior crime involving sex with a minor, Taylor was discovered in bed with a fourteen-year-old girl. The search that led to this discovery was supported by reasonable suspicion. The subsequent search by the Gloucester Township Police occurred with Taylor's explicit consent. Both were constitutional. Therefore, Taylor's motion to suppress is denied.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge